## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Raul Diaz,

        Plaintiff,

v.

                              **MEMORANDUM OF LAW & ORDER**
                                           **ORDER**
                             Case No. 21-cv-679 (MJD/JFD)

Metropolitan Life Insurance Company,

        Defendant.

Brenna Karrer, Chase Hedrick, Zachary Schmoll, Fields Law Firm, for Plaintiff.

Margaret Santos, Daniel Ryan, Margaret Gokhberg, Hinshaw & Culbertson LLP, for Defendant.

## I.    INTRODUCTION

Plaintiff Raul Diaz brought this Employee Retirement Income Security Act ("ERISA") action against Defendant Metropolitan Life Insurance Company ("MetLife") after MetLife determined that Diaz was no longer entitled to benefits under American Airlines' Long Term Disability Plan (the "Plan"). The parties have filed cross-motions for summary judgment on the administrative record. (Doc. Nos. 31, 36, 40.) Because the Court finds MetLife abused its discretion in determining that Diaz was not disabled under the Plan due to his diagnosis of

1

avascular necrosis, the Court will grant Diaz's motion and deny MetLife's

motion.

## II.    BACKGROUND

### A.    Plaintiff's Injury and Subsequent Complications

Plaintiff Raul Diaz is a 63-year-old former American Airlines flight

attendant.  (Doc. Nos. 24–30, Administrative Record ("A.R.") 694.)  He worked

for American Airlines for over 30 years until he fell off a roof in March 2017.  (Id.;

A.R. 1329–1336.)  Diaz suffered a calcaneal fracture of his right foot in the fall.

(Id.)

Diaz developed significant medical complications associated with his foot

injury.  He underwent four surgeries in March 2017, August 2017, December

2018, and November 2020 due to the injury failing to properly heal.  (A.R. 1329–

1336, 464–468, 618, 1134–1138, 1830–1834.)  Diaz and his treating physicians have

reported that he continues to suffer from debilitating symptoms, including

chronic pain, swelling, difficulty wearing closed shoes, and an inability to stand

or walk for more than brief periods of time.  (A.R. 1010–1011, 1131–1133.)

### B.    American Airlines Employee Welfare Benefit Plan

Diaz reports that he has been purchasing disability insurance since he first

became a flight attendant for American Airlines in 1984.  (A.R. 1131.)  Effective

January 1, 2015, American Airlines established the relevant version of its
employee welfare benefit plan (the "Plan"), which is governed by ERISA.  (A.R.
1–301.)  Under the Plan, American Airlines provides long-term disability benefits
to its employees.  (A.R. 183.)

On January 1, 2017, American Airlines appointed MetLife to act as the
claim administrator for its self-insured Plan pursuant to a Master Services
Agreement.  (A.R. 190, 302.)  In its role as claim administrator, MetLife has:

> discretionary authority to determine entitlement to self-insured Plan
> benefits as determined by the plan documents for each claim
> received, to construe the terms of the self-insured Plan in accordance
> with ERISA, and to determine the validity of charges submitted for
> reimbursement under the self-insured Plan, subject to the right of
> the Participant to file an appeal.

(A.R. 339.)

The Plan provides benefits for eligible American Airlines employees who
are unable to work because of "Total Disability."  (A.R. 183–84.)  The Plan defines
"Total Disability" as follows:

> During the elimination period and the first 24 months for which
> LTD [Long-Term Disability] Plan benefits are payable, you are
> considered totally disabled if you are not gainfully employed in any
> type of job for wage or profit and are unable to perform major and
> substantial duties of your own occupation because of sickness or
> accidental bodily injury.

\* \* \*

3

> After 24 months during which benefits are payable, you are
> considered totally disabled if you are not gainfully employed in any
> type of job for any employer and are unable to perform major and
> substantial duties of any occupation or employment for wage or
> profit for which you have become reasonably qualified by training,
> education or experience.

(A.R. 184.)

Even where a participant otherwise satisfies the Plan's "any occupation"

definition of Total Disability after 24 months, however, the Plan does not allow

extended benefits for disabilities caused by "neuromuscular, musculoskeletal

and/or soft tissue disorders."  (A.R. 192–93.)  The Plan defines these "limited

conditions" as follows:

> Neuromuscular, musculoskeletal and/or soft tissue disorders
> include, but are not limited to any disease, injury or disorder of the
> spine, the vertebra(ae), their supporting structures, muscles and/or
> soft tissue; bones, nerves, supporting body structures, muscles
> and/or soft tissue of all joints, extremities and/or major body
> complexes of movement; sprains/strains of all joints and muscles.

(A.R. 193.)

However, the Plan also provides that certain disorders are excepted from

its neuromuscular, musculoskeletal, and soft tissue disorder limitation.

Participants who satisfy the Plan's "any occupation" definition of Total Disability

and suffer from one of these "excepted conditions" are entitled to extended

4

benefits beyond 24 months.  (Id.)  The Plan defines these "excepted conditions,"

in relevant part, as follows:

> This 24-month maximum benefit does not apply to disabilities, if
> such disabilities have documented objective clinical evidence of:
>
> .  .  .
>
> - Radiculopathies (disease of the peripheral nerve roots)
>   supported by objective clinical evidence of nerve pathology;
>
> .  .  .
>
> - Musculopathies (disease of the muscle/muscle fibers)
>   supported by objective pathological evidence on muscle
>   biopsy or electromyography;
>
> - Disabilities caused by the aforementioned conditions –
>   provided objective evidence confirms the diagnosis – will not
>   be subject to the 24-month limitation, but will be benefited
>   according to all other applicable LTD provisions.

(A.R. 193.)

### C.    MetLife Terminates Plaintiff's LTD Benefits After 24 Months

In July 2017, MetLife approved Diaz's initial claim for long-term disability

benefits due to a closed right calcaneal fracture.  (A.R. 1468–1472.)  In its

approval letter, MetLife required Defendant to apply for Social Security

disability benefits.  (Id.)  In April 2018, the Social Security Administration

adjudicated Diaz disabled and began paying him monthly benefits.  (A.R. 1393–

1398.)

On June 19, 2019, MetLife sent Diaz a letter informing him that his long-

term disability benefits would be terminated effective July 5, 2019, which was the

conclusion of his initial 24 months of benefits.  (A.R. 1146.)  In the letter, MetLife

agreed that "[t]he medical information currently on file supports that you remain

unable to perform the duties of a Flight Attendant."  (A.R. 1149.)  However,

MetLife also stated that Diaz did not "meet the eligibility requirements under the

any occupation definition under [American Airlines'] group LTD plan."  (A.R.

1146.)  The only explanation MetLife provided for this determination was that

MetLife initially approved Diaz for benefits due to a limited condition—a closed

right calcaneal fracture—and that MetLife believed Diaz was still disabled due to

this limited condition.  (A.R. 1148–1149.)  MetLife, therefore, concluded that Diaz

had exhausted the 24 months of benefits available to him under the Plan for

disability due to a limited condition.  (A.R. 1148.)

### D.    Plaintiff's First Administrative Appeal to MetLife

On July 5, 2019, Diaz filed his first administrative appeal of MetLife's

termination of his long-term disability benefits.  (A.R. 1131.)  In his appeal, Diaz

explained the ongoing symptoms he was experiencing.  (Id.)  He wrote that he

could "barely walk, stand, sit, and never mind drive," and that "no matter the work I do to try to make myself better, the Doctor has to stop it because of the swelling and the pain, where sometimes it feels like the hardware inside wants to come out."  (Id.)

Diaz also included a letter from one of his treating physicians, Dr. Christopher J. Pappas, a board certified foot and ankle specialist, as well as medical records and a series of photographs of his right foot.  (A.R. 1133–1139.) In his letter, Dr. Pappas stated that Diaz "continues to experience significant pain[,] discomfort and disability with walking and standing activity" and that "[h]e cannot stand and walk for any length of time [at] this point."  (A.R. 1133.) He referred to recent MRI imaging that showed the development of "avascular necrosis of the talus and calcaneus of the right foot."  (A.R. 1133.)  Dr. Pappas also reported that recent imaging of Diaz's back showed "mild disc space narrowing at L3-4, L5-S1 with mild endplate spurring which may be attributed to his initial traumatic injury."  (Id.)  Dr. Pappas opined that Diaz may need extensive bracing and immobilization, "which would preclude his ability to return to work at even a sedentary level."  (Id.)

MetLife provided the materials Diaz submitted with his appeal to one of
its Independent Physician Consultants, Dr. Michael Chen, for review.  (A.R.
1104–1107.)  Dr. Chen did not physically examine Diaz; he based his conclusions
on a review of Diaz's medical records.  (<u>Id.</u>)  Dr. Chen also left two voicemails
with Dr. Pappas's office, but apparently Dr. Pappas did not return those calls.
(<u>Id.</u>)

Dr. Chen summarized Diaz's medical records in his report for MetLife and
concluded that "the medical information supports functional limitations
beyond" the 24-month cutoff for limited conditions under the Plan.  (A.R. 1105.)
Dr. Chen concluded that "[t]he medical supports the disabling diagnosis of
closed right calcaneal fracture and nonunion fracture of right foot."  (A.R. 1107.)
But Dr. Chen also disagreed with Diaz and Dr. Pappas regarding Diaz's
functional abilities and concluded that Diaz's restrictions and limitations were
consistent with the ability to perform sedentary work, including constant sitting
and standing and walking for up to two hours per day.  (A.R. 1106.)

In his initial report, Dr. Chen also noted that Diaz's medical history was
"significant" for lumbar radiculopathy.  (A.R. 1105–1106.)  This statement
prompted MetLife to ask Dr. Chen to provide a "Clarification" to his report

addressing this diagnosis given that radiculopathy is an excepted condition

under the Plan that may entitle a participant to extended benefits.  (A.R. 1108.)

In response, Dr. Chen issued the following Clarification to his report on

September 17, 2019:

> There is listed history of lumbar radiculopathy, but no lumbar
> imaging available to confirm the diagnosis.  Therefore, no
> restrictions are supported for radiculopathy.  Clinical findings are
> conflicting as the majority of examinations are for lower extremity
> trauma/injury and associated course, and no specific lumbar root
> signs documented.

(A.R. 1107.)

Due to an employee error at MetLife, the company's decision on Diaz's

first appeal was not sent to him for four months, until January 7, 2020.  (A.R.

1571, 1575.)  In that decision letter, MetLife denied Diaz's appeal based on Dr.

Chen's report.  (A.R. 1577.)  MetLife did not mention avascular necrosis or

lumbar radiculopathy in its decision letter or explain why it had sided with its

reviewing physician over Diaz's treating physicians.  (Id.)  MetLife justified its

decision as follows:

> Your claim was reviewed in its entirety by a clinical specialist; the
> review included the information submitted with your request for a
> second review.

> The reviewer opined that the information does not impact our prior
> clinical assessment.  The information submitted did not include any
> new information or abnormal clinical evidence to support any

restrictions or limitations or inability to perform any occupation.  As such, the medical information submitted with your request for a Second Review fails to substantiate a disability that would preclude you from performing any occupation.  Therefore, we have concluded that our previous decision to deny your LTD benefits was correct and our original determination is being upheld.

(Id.)

### E.     Plaintiff's Second Administrative Appeal to MetLife

On June 30, 2020, Diaz submitted a second administrative appeal to MetLife, this time with the assistance of counsel.  (A.R. 1018–1029.)  Diaz included a letter from his counsel and additional medical records including a narrative report from Dr. Pappas, an April 4, 2018 Lumbar Spine MRI, and a January 21, 2020 Bone Density Scan.  (A.R. 1020.)  Diaz also submitted findings from March and November 2019 CT scans, a June 10, 2019 ankle MRI, and records from x-rays of his foot.  (A.R. 969–1013, 1003–1004, 1067–1069, 1197–1198.)  The findings from the MRI and CT scans noted "pronounced generalized loss of bone density" and that the condition of Diaz's foot was "consistent with areas of osteonecrosis."  (A.R. 1003, 1068.)

Diaz also submitted findings from a second treating physician, Dr. Robert Mills, who noted "necrotic changes" in Diaz's right foot based on his review of the November 2019 CT Scan.  (A.R. 999–1000.)

10

In his second appeal submission, Diaz asserted that he became disabled "after he fell off the roof of a house and fractured his right foot that has required multiple surgical interventions and has yet to heal, complicated by avascular necrosis." (A.R. 1022.) Diaz also claimed to be disabled due to a "combination of his other comorbidities including lumbar radiculopathy, severe osteoarthritis in his lumbar spine and hips bilaterally," and "chronic pain syndrome relative to his unhealed ankle fracture." (Id.)

In his narrative report supporting Diaz's second appeal, Dr. Pappas stated that Diaz "continues to experience significant pain in the right foot, difficulty walking, and is unable to perform activities of daily living without significant discomfort and pain." (A.R. 1010.) Dr. Pappas also noted that Diaz's last procedure on his right foot "has failed to heal" and that "there was concern for an avascular necrosis of the talus and calcaneus which is contributing to significant pain and difficulty walking." (Id.) In addition, Dr. Pappas opined on the lower back pain that Diaz reported after his injury, stating that "[o]bjectively, radiographic and MRI findings indicated pathology in the lower lumbar region of [Plaintiff's] spine." (A.R. 1010–1011.) He concluded that even with further surgical intervention, Diaz would continue to suffer from these symptoms,

precluding his ability to return to work without significant restriction or limitation.  (Id.)

The medical records Diaz submitted to MetLife consistently note a diagnosis of avascular necrosis from appointments with treating physicians on October 31, 2019, November 5, 2019, November 11, 2019, November 19, 2019, February 10, 2020, February 12, 2020, March 9, 2020, and September 16, 2020. (A.R. 1784–1825.)

MetLife arranged for another one of its Independent Physician Consultants, Dr. Arash Yaghoobian, to review the materials Diaz submitted with his second appeal.  (A.R. 808.)  MetLife asked Dr. Yaghoobian to respond to several questions in his review, including the following:

> Given consideration to both the subjective and clinical information, in your opinion does the evidence suggest that the claimant suffers from a medical condition or combination of conditions of such severity to warrant the placement of restrictions and/or limitations on his/her activities for the time period of 07/06/2019 to present due to lumbar radiculopathy and avascular necrosis?

(A.R. 810 (emphasis added).)

Like Dr. Chen, Dr. Yaghoobian never physically examined Diaz, but rather relied on a review of Diaz's medical records to create his report for MetLife.  Dr. Yaghoobian concluded that Diaz was suffering from "permanent" restrictions

and limitations.  (A.R. 812.)  But Dr. Yaghoobian, like Dr. Chen, also concluded

that Diaz's restrictions and limitations were consistent with the ability to perform

sedentary work.  (Id.)  He also agreed with Dr. Chen that Diaz's lumbar

radiculopathy diagnosis was not supported.  (A.R. 811.)  Based on his review of

the 2018 MRI imaging evidence, Dr. Yaghoobian concluded that "[t]he imaging

reports did not indicate severe canal stenosis at any level or nerve

impingement."  (Id.)  However, he also concluded that "[e]ven though lumbar

radiculopathy is not supported, the claimant requires [restrictions and

limitations] due to low back pain and right lower extremity problems."  (Id.)

     As with Dr. Chen's initial report, MetLife also had to go back to Dr.

Yaghoobian and ask him to provide Clarifications to his initial report.  (A.R. 709.)

Specifically, MetLife asked Dr. Yaghoobian for a Clarification because he failed

to address Diaz's avascular necrosis diagnosis as requested.  (A.R. 709, 813.)  On

August 12, 2020, Dr. Yaghoobian provided the following Clarification regarding

Diaz's avascular necrosis diagnosis:

> Despite a medical diagnosis of avascular necrosis, there is no
> evidence of imaging to support this diagnosis.  The aforementioned
> [restrictions and limitations] are associated with the claimant's low
> back pain and right lower extremity problems.  No [restrictions and
> limitations] are supported as a result of avascular necrosis.

(A.R. 813.)

13

Following Dr. Yaghoobian's review and submission of his report to Diaz's counsel, Diaz's counsel sent MetLife two additional letters contesting Dr. Yaghoobian's conclusions.  (A.R. 839–840, 896–898.)  In his letters, Diaz's counsel asserted that the imaging evidence from Diaz's 2018 MRI supported his lumbar radiculopathy diagnosis and noted that Diaz was scheduled for a fourth surgery on his foot "to address his non-union fracture in his right ankle and foot complicated by avascular necrosis."  (Id.)  Diaz's counsel also disagreed with the assertion that Diaz could perform sedentary work based on Diaz's "low back pain, diabetic neuropathy, and hemorrhoids, and anal intraepithelial neoplasia in addition to his right foot necrosis."  (A.R. 839.)

Diaz provided additional medical records to MetLife in December 2020. (A.R. 828.)  These records included May 2018 treatment records from Dr. Jessica Garau, an Interventional Pain Medicine specialist.  (A.R. 830.)  Dr. Garau noted that in May 2018 Diaz continued to suffer from significant lower back pain that he rated as "8/10 in intensity," pain in his right foot, and tingling and numbness of the hands and feet.  (Id.)  Dr. Garau also noted that Diaz had undergone an epidural injection for his lower back pain but that it had not provided him any relief.  (Id.)

14

MetLife provided these additional records to Dr. Yaghoobian but they did not cause him to change his initial conclusions.  (A.R. 813.)  For avascular necrosis, Dr. Yaghoobian wrote that "there remains no evidence of imaging to support this diagnosis."  (Id.)  Throughout the course of his review, Dr. Yaghoobian did not request any additional imaging or other records, or attempt to speak with Diaz's treating physicians, writing that "there was no need to speak to a treating provider to obtain further clarification."  (A.R. 809.)

MetLife informed Diaz that it was denying his second appeal in a letter dated January 14, 2021.  (A.R. 773–77.)  MetLife explained that it was denying his appeal because Diaz had exhausted his 24 months of benefits for a limited condition and that it had determined Diaz was not disabled due to any non-limited or excepted conditions.  (Id.)  MetLife relied on Dr. Yaghoobian's report to support this conclusion.  (Id.)

In its final decision letter, MetLife acknowledged that avascular necrosis is "a condition that is not limited by the Plan," but relied on Dr. Yaghoobian's assessment that there was "no evidence on imaging reports in the claim file to support this condition."  (A.R. 774.)  MetLife also rejected Diaz's lumbar radiculopathy diagnosis for a second time based on Dr. Yaghoobian's assessment

15

of Diaz's MRI imaging.  (Id.)  Finally, MetLife rejected Diaz's attempt to rely on

the other medical conditions mentioned in his second appeal because it agreed

with Dr. Yaghoobian that Diaz had not submitted evidence showing that his

restrictions and limitations were caused by these other conditions.  (A.R. 775.)

After exhausting his administrative remedies on his claim with MetLife,

Diaz filed the present action before this Court on March 10, 2021.  (Doc. 1.)  The

parties have now filed cross motions for summary judgment based on the

administrative record.  (Doc. Nos.  31, 36, 40.)

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Id. at 323.  "A dispute is genuine if the evidence is such that it

could cause a reasonable jury to return a verdict for either party; a fact is material

if its resolution affects the outcome of the case."  Amini v. City of Minneapolis,

643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248, 252 (1986)).

**B.      ERISA Standard of Review**

A benefits determination made by an administrator of an ERISA-governed

employee welfare benefit plan is "a fiduciary act (i.e., an act in which the

administrator owes a special duty of loyalty to the plan beneficiaries)." <u>Metro.</u>

<u>Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 111 (2008).  ERISA allows a covered

participant to bring a lawsuit to recover improperly withheld benefits.  29 U.S.C.

§ 1132(a)(1).

Where, as here, an ERISA plan grants the plan administrator discretionary

authority to interpret plan provisions and determine claimant eligibility, courts

"review the administrator's decision for an abuse of discretion." <u>Richmond v.</u>

<u>Life Ins. Co. of N. Am.</u>, 51 F.4th 802, 805 (8th Cir. 2022) (citing <u>McIntyre v.</u>

<u>Reliance Standard Life Ins. Co.</u>, 972 F.3d 955, 958-59 (8th Cir. 2020)).  "Under the

abuse of discretion standard, the court must affirm the plan administrator's

interpretation of the plan unless it is arbitrary and capricious." <u>Manning v. Am.</u>

<u>Republic Ins. Co.</u>, 604 F.3d 1030, 1038 (8th Cir. 2010) (citing <u>Midgett v. Wash.</u>

<u>Group Int'l Long Term Disability Plan</u>, 561 F.3d 887, 896–97 (8th Cir. 2009)).

To determine whether a plan administrator's decision is arbitrary and capricious, courts look at whether the administrator's decision is supported by "substantial evidence," which is "more than a scintilla, but less than a preponderance." Rutledge v. Liberty Life Assur. Co. of Bos., 481 F.3d 655, 659 (8th Cir. 2007) (citations omitted).  This inquiry is deferential, but the plan administrator must still provide a "reasonable explanation" to the participant for its benefits determination and it "cannot simply ignore relevant evidence or arbitrarily refuse to credit a claimant's reliable evidence." Clapp v. Citibank, N.A. Disability Plan (501), 262 F.3d 820, 828 (8th Cir. 2001) (citation omitted); Waldoch v. Medtronic, Inc., 757 F.3d 822, 833 (8th Cir. 2014), as corrected (July 15, 2014) (quoting Wilcox v. Liberty Life Assurance Co., 552 F.3d 693, 701 (8th Cir. 2009)).  In determining whether a plan administrator has abused its discretion, courts consider "both the quantity and quality of the evidence" upon which the administrator relied. Clapp, 262 F.3d at 828 (citation omitted).

**C.    The Plan Allows for Extended Benefits Based on Lumbar Radiculopathy and Avascular Necrosis**

To receive benefits beyond 24 months, the Plan requires Diaz to satisfy its definition of "total disability" due to a non-limited or excepted condition.  (A.R. 192–93.)  In his motion, Diaz argues that he qualifies for extended benefits

18

because he is disabled due to lumbar radiculopathy and avascular necrosis. (Doc. 41 at 6.)  As explained further below, both of these conditions may qualify for extended benefits under the Plan.

In his briefing before this Court, Diaz also alleged that he qualifies for extended benefits based on two other conditions, complex regional pain syndrome ("CRPS") and musculopathies.  (Doc. 41 at 9; Doc. 43 at 1.)  However, Diaz only asserts CRPS in his brief opposing MetLife's motion; he did not raise this condition as a basis for summary judgment in his own motion.  Diaz has, therefore, waived his right to obtain summary judgment on this basis.  See Mallak v. City of Brainerd, No. CV 13-2119 (DWF/LIB), 2017 WL 3668759, at *17 (D. Minn. Aug. 23, 2017) ("because this issue was not raised by the City Defendants in their opening brief, the Court declines to grant summary judgment to the City Defendants on this issue").   Even if Diaz had not waived his arguments based on CRPS, Diaz fails to cite record evidence explaining how this condition is responsible for his disability.  Diaz only notes that this diagnosis was included in his medical records.  (Doc. 43 at 8–9.)  But he does not explain why this condition falls outside of the Plan's limitations such that it could qualify him for extended benefits.  Nor does Diaz cite any medical opinion stating that

CRPS is precluding him from working.  Without evidence of this nature, the

Court cannot conclude that MetLife abused its discretion by failing to grant Diaz

extended benefits based on his CRPS diagnosis.

The same is true of Diaz's arguments based on his alleged musculopathy

diagnosis.  Diaz did raise this condition in his motion, but he did not respond to

MetLife's argument in its opposition that Diaz's treating physicians never

diagnosed him with this condition.  (Doc. 45 at 8–9 (citing A.R. 831, 1375).)  Diaz

also did not respond to MetLife's argument that he failed to comply with the

Plan's requirement that a musculopathy diagnosis be supported by "objective

pathological evidence on muscle biopsy or electromyography."  (Id. (citing A.R.

192–93).)  Federal Rule of Civil Procedure 56(e) allows courts to consider facts to

be undisputed and/or grant summary judgment on certain issues where "a party

fails to properly address another party's assertion of fact as required by Rule

56(c)."  See Embaye v. Minneapolis Police Dep't, No. 14-CV-2896 (PJS/TNL), 2016

WL 3960374, at *4 (D. Minn. June 22, 2016) (considering well-supported factual

allegations as undisputed on summary judgment where the plaintiff failed to

submit evidence to counter them).  Based on MetLife's opposition arguments and

Diaz's lack of evidence these arguments highlight, the Court finds that Diaz has

not shown that MetLife abused its discretion by failing to grant Diaz extended benefits based on an alleged musculopathy diagnosis either.

Diaz did support his arguments based on his lumbar radiculopathy diagnosis with citations to record evidence, however, and this condition is an explicit basis for extended benefits under the Plan.  The Plan defines "radiculopathy" as an excepted condition that falls outside the scope of its neuromuscular, musculoskeletal, and soft tissue disorder limitation.  (A.R. 192–93.)  The Plan requires that participants provide "objective clinical evidence of nerve pathology" to qualify for extended benefits based on this excepted condition.  (A.R. 193.)

For avascular necrosis, it is MetLife that has failed to provide any meaningful arguments in opposition to Diaz's assertion that this condition may qualify him for extended benefits under the Plan.  Indeed, it is unclear from MetLife's briefing whether it agrees that this condition is a non-limited condition or not.  (See Doc. 45 at 9.)  In his motion, Diaz asserted that avascular necrosis is not a limited condition because it falls outside the scope of the Plan's neuromuscular, musculoskeletal, and soft tissue disorder limitation.  (Doc. 48 at 3–4.)  Based on MetLife's failure to cite to any portion of the Plan or otherwise

21

provide any analysis to counter Diaz's interpretation of the Plan, the Court will

accept Diaz's argument that avascular necrosis is a non-limited condition under

the Plan.

MetLife likely did not counter Diaz's assertion that avascular necrosis is a

non-limited condition because any interpretation of the Plan finding this

condition to fall within the Plan's neuromuscular, musculoskeletal, and soft

tissue disorder limitation would not be reasonable.  Although courts afford

deference to an administrator's interpretation of a plan's provisions, those

interpretations must still find a reasonable basis in the plan's language.  Cash v.

Wal-Mart Grp. Health Plan, 107 F.3d 637, 641 (8th Cir. 1997).  Here, Diaz

explained that avascular necrosis does not fall within the Plan's neuromuscular,

musculoskeletal, or soft tissue disorder limitation because it is a circulatory

system disorder relating to the loss of blood supply to the bone.  (Doc. 48 at 3–4.)

Diaz's interpretation is supported by the medical dictionary definition of

avascular necrosis.  "Avascular necrosis" is defined as "necrosis of bone tissue

due to impaired or disrupted blood supply (as that caused by traumatic injury or

disease) and marked by severe pain in the affected region and by weakened bone

that may flatten and collapse." <u>Merriam-Webster's Medical Dictionary</u>,

Merriam-Webster, https://unabridged.merriamwebster.com/medical/

avascular%20necrosis.  The condition is also known as "asceptic necrosis" and

"osteonecrosis."  <u>Id.</u>  MetLife fails to provide any reasonable interpretation of the

Plan in opposition to Diaz's interpretation of the Plan that this circulatory system

disorder is a non-limited condition.

Further, MetLife is precluded from arguing that avascular necrosis is a

non-limited condition in this case because doing so would be inconsistent with

the position MetLife took at the administrative level.  One of the factors courts

examine in determining whether an administrator's interpretation of a plan is

reasonable is "whether the [administrator] has interpreted the relevant terms

consistently."  <u>Cash</u>, 107 F.3d at 641.  Here, MetLife repeatedly referred to

avascular necrosis as a "<u>non</u>-limited duration benefit" during the administrative

review process.  (<u>See, e.g.</u>, A.R. 706 ("NON LDB conditions: lumbar

radiculopathy, avascular necrosis . . ."); 712, 789 ("We also considered your

statements that your client was unable to return to work due to avascular

necrosis, <u>a condition that is not limited by the Plan</u> . . .") (emphasis added), 813

("PFR to advise and clarify if any of the opined R/Ls . . . are associated with non-

LDB condition: avascular necrosis . . .".) Indeed, MetLife asked Dr. Yaghoobian to review Diaz's medical records a second time for evidence of avascular necrosis and issue a Clarification addressing this condition, presumably because it believed such a diagnosis could entitle Diaz to extended benefits as a non-limited condition. (A.R. 709, 812–13.)

The Court, therefore, determines that Diaz could be entitled to extended benefits under the Plan based on either lumbar radiculopathy or avascular necrosis, provided these diagnoses are supported by sufficient evidence.

**D.**   **MetLife Did Not Abuse its Discretion in Denying Diaz's Claim Based on Lumbar Radiculopathy, but it Did Abuse its Discretion in Denying his Claim Based on Avascular Necrosis**

Based on the Court's review of the administrative record, MetLife satisfied its duty under ERISA to provide Diaz with a reasonable explanation as to why it was denying his claim based on his lumbar radiculopathy diagnosis. But MetLife failed to do the same with regard to Diaz's avascular necrosis diagnosis.

**1.**   **A Denial of Benefits Based on the Absence of Evidence Must be Supported by a Reasonable Explanation Under the Substantial Evidence Standard**

As noted above, ERISA requires that administrators of covered employee welfare benefits plans base their decisions to grant or deny benefits on "substantial evidence." <u>Rutledge</u>, 481 F.3d at 659. In a case like this one where

24

the administrator denies benefits based on an alleged <u>lack</u> of evidence, however,

it can be difficult to apply the substantial evidence standard.  To confirm that an

administrator has not acted arbitrarily in making a benefits determination,

reviewing courts require the administrator to provide a "reasonable explanation"

for its determination.  <u>Clapp</u>, 262 F.3d at 828; <u>Waldoch</u>, 757 F.3d at 833.  This

requirement helps ensure that administrators satisfy their fiduciary obligation to

provide plan participants with a "full and fair review" process.  29 U.S.C. §

1133(2).

> **2.    MetLife Did Not Abuse its Discretion in Denying Benefits Based on Diaz's Lumbar Radiculopathy Diagnosis.**

MetLife provided Diaz with a reasonable explanation as to why it was not

crediting his evidence of lumbar radiculopathy.  In its January 2021 letter,

MetLife relied on Dr. Yaghoobian's analysis of the imaging reports Diaz

submitted to reject his claim that he was suffering from lumbar radiculopathy.

(A.R. 774.)  MetLife credited Dr. Yaghoobian's assessment that the imaging "did

not demonstrate severe canal stenosis at any level or any nerve impingement."

(<u>Id.</u>)  Dr. Yaghoobian also explained in his report that he found "no evidence of

clinical (sensory, motor, or reflex changes) findings consistent with

radiculopathy for the time period in question."  (A.R. 810–13.)

Although Dr. Yaghoobian's conclusion conflicted with that of Diaz's treating physicians, the Eighth Circuit has observed that "[w]hen there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physician, the plan administrator has discretion to deny benefits unless the record does not support denial." Johnson v. Metro. Life Ins. Co., 437 F.3d 809, 814 (8th Cir. 2006).  Here, MetLife relied on Dr. Yaghoobian's report, which cites to record evidence and explains why that evidence supports denial.  (A.R. 774.)  This satisfies MetLife's obligation under ERISA to provide a reasonable explanation for its decision based on record evidence.

> **3.      MetLife Did Not Provide a Reasonable Explanation for its Rejection of Diaz's Avascular Necrosis Diagnosis**

MetLife, however, did not provide Diaz with a reasoned explanation based on record evidence in rejecting his claim based on avascular necrosis.  It merely relied on one reviewing physician's ambiguous and conclusory statement that Diaz lacked "imaging" evidence to support this diagnosis.  (A.R. 774.)  MetLife's failure to inquire further into the meaning of this statement or to provide Diaz with a more fulsome explanation as to the meaning of this statement compels the

26

conclusion that its decision to deny Diaz's claim on this basis was not based on

substantial evidence.

As a threshold matter, MetLife's decision letters make clear that it denied

Diaz's claim because it determined that he was disabled due to limited

conditions for which extended benefits are not available, not because it

determined that he was not totally disabled and could return to work.  (A.R. 773–

777, 1146–1150, 1575–1578.)  Indeed, MetLife repeatedly stated that it was

denying Diaz's claim because he did not satisfy the Plan's "any occupation"

definition of total disability "<u>due to a condition not limited by the Plan,</u>" not due

to the complete absence of total disability.  (A.R. 773 (emphasis added); <u>see also</u>

A.R. 1149, 1576.)  MetLife also took the time to reject each of Diaz's claims that he

was disabled due to non-limited conditions, including his claims that he was

disabled due to lumbar radiculopathy and avascular necrosis.  (A.R. 774.)

Additionally, the only basis MetLife provided to distinguish the Social

Security decision that adjudicated Diaz as disabled from its own decision to the

contrary was its statement that "[u]nlike Social Security Disability benefits, the

LTD Plan limits benefits due to certain conditions to a combined lifetime

maximum of 24 months . . . and the file lacked medical information to support

[Diaz] had limitations related to a condition or conditions excluded or not limited by the Plan." (A.R. 776.) MetLife continued to make similar statements in its briefing before this Court, arguing that Diaz's "claim for disability benefits is limited by the Plan's 24-month maximum benefit for neuromuscular, musculoskeletal, and/or soft tissue disorders limitation." (Doc. 33 at 2.) These statements make clear that MetLife's denial of benefits depended on its rejection of Diaz's evidence of a non-limited or excepted condition, namely lumbar radiculopathy and avascular necrosis, and did not depend on any independent determination that Diaz could return to work.

To the extent MetLife is relying on the claim that it did make an independent determination that Diaz did not satisfy the Plan's definition of total disability even if he does suffer from a non-limited condition like avascular necrosis, that determination would not be supported by substantial evidence in the administrative record. Diaz argues that avascular necrosis is disabling because it prevents him from doing any weightbearing activities and causes him chronic pain. (Doc. 41 at 9.) Diaz's treating physicians as well as the SSA decision support a finding that Diaz could not return to work at even a sedentary level. (A.R. 1000, 1010–1011, 1133, 1153, 1247, 1355, 1393.) Whereas, all that

MetLife would have to support an opposite finding that Diaz could return to work was the conclusory allegations of its two reviewing physicians.

Both of MetLife's reviewing physicians did include assessments of Diaz's functional capabilities in their reports, but they made no effort to explain their bases for these conclusory assessments.  (A.R. 812, 1106.)  They simply stated their conclusions.  (Id.)  Without ever physically examining Diaz, Dr. Yaghoobian went so far as to make specific conclusions about the amount of time Diaz was able to "sit, stand, walk, lift/carry, push/pull, climb, balance, stoop, kneel, crouch, crawl, reach at waist level/above shoulder level and below waist level, handle, finger, and feel" [sic].  (A.R. 812.)  MetLife fails to explain how either physician could reliably make such specific assessments of Diaz's functional abilities without ever examining him.  Nor can the Court determine whether these assessments were sound given that neither reviewing physician explained how the record evidence supports these assessments.  Therefore, MetLife would have abused its discretion had it based its decision to deny Diaz's claim on these assessments of his functional capabilities.

Because MetLife's decision to deny Diaz's claim depended on its rejection of his lumbar radiculopathy and avascular necrosis diagnoses, it was required to

provide a reasonable explanation for rejecting the evidence supporting these

diagnoses.  Clapp, 262 F.3d at 828.  As explained above, MetLife's explanation for

rejecting Diaz's evidence of lumbar radiculopathy was supported by a

reasonable explanation analyzing medical evidence in the record.  The same is

not true of MetLife's rejection of Diaz's evidence of avascular necrosis.

MetLife's sole basis for rejecting Diaz's avascular necrosis diagnosis is Dr.

Yaghoobian's statement that "despite a medical diagnosis of avascular necrosis,

there is no evidence of imaging to support this diagnosis."  (A.R. 813, 774.)  Dr.

Chen's review cannot provide substantial evidence to support MetLife's rejection

of this diagnosis because he did not state any conclusions regarding the evidence

underlying Diaz's avascular necrosis diagnosis in his report.  (A.R. 1104–1107.)

Contrary to Dr. Yaghoobian's statement, however, the record is filled with

evidence of medical imaging to support the claim of Diaz and his treating

physicians that Diaz suffers from avascular necrosis.  This includes a March 2019

CT scan, a June 2019 MRI, a November 2019 CT Scan, a bone density test, and x-

rays.  (A.R. 972–73, 980, 991, 999–1000, 1003–1004, 1067–1068, 1197–1198.)

Indeed, MetLife mentions this imaging evidence in its own summary judgment

briefing.  (Doc. 45 at 4.)  Dr. Yaghoobian even noted in his analysis that Diaz's

medical records were "significant" for avascular necrosis.  (A.R. 810.)  He then

failed to explain his statement that the record lacked "evidence of imaging to

support this diagnosis" and attributed Diaz's restrictions and limitations to "low

back pain and right lower extremity problems."  (A.R. 811, 813.)  But Dr.

Yaghoobian neither explained how avascular necrosis is not a "right lower

extremity problem" nor why the medical imaging reports Diaz submitted in

support of this diagnosis were insufficient.

Moreover, Dr. Yaghoobian's statement that the record lacked imaging

evidence to support avascular necrosis is ambiguous.  It is unclear if Dr.

Yaghoobian meant that the imaging records Diaz submitted to support this

diagnosis were somehow deficient, like the imaging records Diaz submitted in

support of his lumbar radiculopathy diagnosis, or if he simply failed to review

these imagining records.  Whichever possibility is true, however, MetLife abused

its discretion by failing to obtain further clarification from Dr. Yaghoobian before

making its benefits determination on the basis of this statement.  If Dr.

Yaghoobian failed to review all of the imaging records Diaz submitted, then it

was an abuse of discretion for MetLife to rely on a selective analysis of the

evidence to support its denial of benefits.  See, e.g., Norris v. Citibank, N.A.

Disability Plan (501), 308 F.3d 880, 885 (8th Cir. 2002); Waldoch, 757 F.3d at 833

(noting that a plan administrator "cannot simply ignore relevant evidence").  If

Dr. Yaghoobian did review the imaging records and found them to be

insufficient for a specific reason, then he should have provided a reasonable

explanation for his findings in his written report and MetLife should have passed

those findings on to Diaz in its benefits determination letter.  A Plan

administrator does not satisfy its fiduciary duties under ERISA by simply asking

a reviewing physician if he agrees that a diagnosis lacks support and then

repeating the physician's conclusory agreement that it does lack support on to

the plan beneficiary.

For example, in Norris v. Citibank, N.A. Disability Plan (501), the Eighth

Circuit affirmed the district court's finding that a plan administrator abused its

discretion where the administrator "seized upon" several pieces of "equivocal"

evidence concerning the extent of the participant's disability.  308 F.3d 880, 885

(8th Cir. 2002).  The administrator abused its discretion by failing to "address the

extensive medical evidence relating to [the plaintiff's] disability or the consistent

conclusions of her doctors . . . that she could not work."  Id.  Like in Norris,

MetLife seized upon evidence from its reviewing physicians suggesting that Diaz

was disabled solely due to a musculoskeletal disorder that was limited by the plan, i.e., the fracture in his foot from years earlier.  It did so without explaining why it did not credit the contrary evidence from Diaz's treating physicians, who concluded that Diaz was also disabled due to avascular necrosis, a non-limited condition.  Therefore, no matter what meaning Dr. Yaghoobian ascribed to his ambiguous statement concerning the evidence supporting Diaz's avascular necrosis diagnosis, MetLife abused its discretion by denying Diaz's claim based on Dr. Yaghoobian's statement.

Moreover, according to Diaz's treating physician, Dr. Pappas, avascular necrosis helps explain why Diaz's calcaneal fracture has not healed for years despite four surgeries.  (A.R. 1133, 1010.)  Dr. Yaghoobian and MetLife, on the other hand, provide no explanation for this failure to heal while continually attributing Diaz's work restrictions and limitations to "right lower extremity" problems.  (A.R. 813.)  Again, Dr. Yaghoobian failed to explain how Diaz's avascular necrosis, which affects his right foot, was not a "right lower extremity problem."  These facts are further evidence that MetLife abused its discretion in relying on its IPC reviews as the sole basis for its benefits determination.

The Court's determination that MetLife abused its discretion by relying on Dr. Yaghoobian's ambiguous statement regarding a lack of imaging evidence is further supported by procedural irregularities that are apparent from the Court's review of the administrative record.  Courts sometimes apply a less deferential "sliding scale" standard of review in ERISA cases where a plan administrator's review is marked by such irregularities.  See McIntyre v. Reliance Standard Life Ins. Co., 972 F.3d 955, 959-60 (8th Cir. 2020).  But the Court will not apply that standard given that Diaz did not raise this argument in his motion and the irregularities present here do not appear "egregious" enough to warrant it.  Id. at 963 n.3.  But the Court's review of the administrative record does cause some concern about the quality of MetLife's review of Diaz's claim.

The IPC review reports that MetLife relied on were marked by errors that required MetLife to return both reports to the reviewing physicians multiple times for "clarifications" before MetLife was satisfied with them.  In his initial report, Dr. Chen stated that Diaz's medical records indicated a lumbar radiculopathy diagnosis.  MetLife asked him to provide a "Clarification" for this statement, which prompted him to quickly reject this diagnosis, writing that there was "no lumbar imaging available to confirm the diagnosis."  (A.R. 1107-

1108.)  Again, a statement like this is ambiguous and does not provide a sufficient basis to deny a claim on its own for the reasons explained above regarding Dr. Yaghoobian's similar statement concerning Diaz's avascular necrosis diagnosis.  If a plan administrator relies on its consulting physicians for its determination, those consulting physicians must explain <u>why</u> the evidence, imaging or otherwise, is insufficient to support a diagnosis.  If it were not for Dr. Yaghoobian's more fulsome explanation regarding Diaz's lumbar radiculopathy diagnosis in his second round review, the Court would have also found that MetLife abused its discretion in relying on Dr. Chen's ambiguous statement to reject Diaz's lumbar radiculopathy diagnosis.  (A.R. 811, 813.)

Dr. Yaghoobian also made an omission in his initial review of Diaz's medical records that prompted MetLife to ask him for a Clarification.  In its IPC review questionnaire, MetLife explicitly asked Dr. Yaghoobian to address the "clinical evidence of avascular necrosis" and to "explain the medical rationale for your opinion."  (A.R. 810.)  But Dr. Yaghoobian failed to respond to this inquiry altogether in his first submission to MetLife.  (A.R. 810–11.)  When MetLife returned to Dr. Yaghoobian for a Clarification because of this omission, his response was strikingly similar to the Clarification Dr. Chen provided regarding

lumbar radiculopathy, writing that there was "no evidence of imaging to support this diagnosis." (A.R. 813.)

Further, another procedural irregularity occurred when an employee error at MetLife caused a months' long delay in communicating the company's decision on Diaz's first administrative appeal to him. (A.R. 1571.)

Even without these procedural irregularities, however, the record shows that MetLife abused its discretion by crediting Dr. Yaghoobian's conclusory and ambiguous statement concerning Diaz's avascular necrosis diagnosis over the reasoned conclusions of Diaz's treating physicians. MetLife failed to provide a "reasonable explanation" for its decision to side with its consulting physician over Diaz's treating physicians for this diagnosis. Clapp, 262 F.3d at 828; Waldoch, 757 F.3d at 833. MetLife cannot rewrite the administrative record now and without a reasonable explanation to support its decision, the only conclusion the Court is able to draw from the record is that MetLife's denial of Diaz's claim was arbitrary and capricious and, therefore, an abuse of discretion.

## ORDER

Based on the foregoing reasons, as well as the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Plaintiff's Motion for Summary Judgment (Doc. Nos. 36, 40) is
     **GRANTED**;

2.   Defendant's Motion for Summary Judgment (Doc. 31) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  January 5, 2023                    s/Michael J. Davis
                                          Michael J. Davis
                                          United States District Court